## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**ROBIN JEAN LYON CINI,**

Debtor.

Case No. **10-62715-11**

**ROBIN JEAN LYON CINI,**

Plaintiff.

-vs-

**VISCOMI & GERSH, PLLP, PETER F. CARROLL, BLUE CROSS AND BLUE SHIELD OF MONTANA, INC., ROBIN JEAN LYON CINI, PERSONAL REPRESENTATIVE OF THE ESTATE OF HANNA CINI,** and **ROBIN JEAN LYON CINI, CONSERVATOR FOR BAYDEN CINI,**

Defendants.

Adv No. **11-00007**

## MEMORANDUM OF DECISION

At Butte in said District this 3rd day of May, 2013.

Trial of the remaining claims in this adversary proceeding was held at Missoula on March 14 and 15, 2013, along with the hearing on the Debtor/Plaintiff's motion for approval of compromise settlement filed in the above-captioned Chapter 11 case.[1]  Plaintiff Robin Jean

---

[1]  The settlement motion was filed in Case No. 10-62715-11 at Docket No. 451, and resolves the Debtor's claims in Count I against the Defendants Personal Representative, the Conservator and Viscomi and Gersh, PLLP.

1

Lyon[2] ("Robin") appeared and testified, represented by attorneys James H. Cossitt ("Cossitt") and Mary DeNevi of James H. Cossitt, PC, of Kalispell, Montana.  Defendant Peter F. Carroll ("Carroll"), an attorney, of Kalispell filed an objection to the proposed compromise settlement, and appeared pro se and testified.  Exhibits ("Ex.") 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, A, B, C, D, E, F, G, H, I, J, K, L, Q, U, V, W, Z, AA, BB, CC, DD, EE, FF, and GG, all were admitted into evidence.[3]  Witnesses David Sandler, Michael Viscomi, Jeff Weyh, and Christopher Yerkes also testified.  At the conclusion of the parties' cases-in-chief the Court granted the parties 15 days to file post-trial memoranda, which have been filed and reviewed by the Court together with the evidence and applicable law.  This matter is ready for decision.

This Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(a) & (b).  The remaining claims to determine the validity and priority of liens and interests, seeking a judgment of contempt against Carroll for violation of the automatic stay, and approval of compromise settlement, are core proceedings under 28 U.S.C. § 157(b)(2).  This Memorandum of Decision includes the Court's findings of fact and conclusions of law under F.R.B.P. 7052 (applying Rule 52, Fed. R. Civ. P. in adversary proceedings).

## FACTS & PROCEDURAL HISTORY

This case arises from an automobile accident which injured Robin and her minor son, and

---

[2]  Robin changed her name from Robin Cini to her maiden name Robin Lyon after the dissolution of her marriage to Nigel Cini.

[3]  The Court took judicial notice of Ex. 16, a judgment against Robin's former spouse Nigel Cini.

caused the death of her daughter Hanna.  Robin's marriage to Nigel Cini ("Nigel") subsequently

was dissolved.  Carroll was Nigel's attorney for part of the marital dissolution.

Plaintiff's counsel and Carroll each signed a Final Pretrial Order ("PTO") (Dkt. 179),

which the Court approved on March 8, 2013.  The following facts are agreed upon in the

approved PTO and require no proof:

a. On April 16, 2009, Robin was in an automobile accident, in which she
sustained injuries, her son BC ("BC") sustained injuries, and her daughter Hanna
Cini ("Hanna") passed away.

b. Robin was appointed personal representative ("PR") of the Probate
Estate of Hanna Cini (the "Estate") on April 23, 2009, in Case No. DP-09-67(A),
Montana Eleventh Judicial District Court, Flathead Court.

c. On or about July 29, 2009, Robin and her ex-husband Nigel Cini
("Nigel") entered into an Agreement (the "7/29/09 Agreement") relating to
division of "any monies previously or hereinafter obtained on the wrongful death
or survivor claims for Hanna Cini as a result of the automobile accident," in
which they agreed that "the net settlement or judgment proceeds (after all
applicable attorney fees, costs, or estate expenses are deducted), shall be equitably
divided" as follows: 42.5% of the proceeds to Robin, 42.5% to Nigel and 15% to
BC. Nigel assigned to Robin the first $50,000 in net proceeds payable to him.

d. On August 11, 2009, the district court entered an order in Case No.
DP-09-67(A) which, among other things, approved the division set out in the
7/29/09 Agreement.

e. On November 25, 2009, Robin filed a complaint in three capacities
(individually, as Conservator of BC, and as PR), asserting damage claims on
behalf of the Estate (the "damages case"), docketed as Case No. DV-09-1488(A)
and #DP-09-67(A) in the Montana Eleventh Judicial District Court, Flathead
County.

f. Robin filed a petition for relief under Chapter 13 of the Bankruptcy
Code on November 19, 2010. The case subsequently was converted to Chapter 11.

g. [Left blank in original.]

h. Robin filed a complaint commencing this adversary proceeding on

3

January 24, 2011, to resolve competing claims to proceeds of the damages case and other monies that were or might become payable to the Estate (the "Trust Fund"). She filed a 1st Amended and Substituted Complaint on February 13, 2011.

i. Robin is named as a defendant in her representative capacities as PR of the Estate and BC's conservator. Viscomi & Gersh, PLLP ("Viscomi"), is named as a defendant because the firm is the custodian of the Trust Fund. Peter Carroll is named as a defendant because of interests he claims in the Trust Fund.

j. On June 9, 2012, this Court entered judgment dismissing all claims against Defendant Blue Cross and Blue Shield of Montana, Inc. ("BCBS") and finding that BCBS has no claim or interest in the Fund (Dkt. 68).

k. By order dated January 30, 2012, the Court dismissed all claims against Defendants John Darren Cogar and Suzanne Cogar (the "Cogars"). (Dkt. 124) Separate judgment did not enter on that order.

l. On February 25, 2013, this Court entered judgment[4] against Defendant Nigel Cini, allowing Plaintiff's Third Motion for Summary Judgment (Against Nigel Cini) (Dkt. 161) and ruling that he "has no valid lien, claim or other interest in any and all claims, recoveries and proceeds arising out of Case# DV-09-1488(A) and #DP-09-67(A) in the Montana Eleventh Judicial District Court, Flathead County."

m. Robin and Nigel obtained a dissolution of their marriage in Case No. DR-08-483(A), Eleventh Judicial District Court, Flathead County.

n. On October 15, 2010, Robin obtained a judgment against Nigel in Case No. DR—8-483(A) for failure to pay child support in the amount of $7,885.00. On November 29, 2010, the state court issued an order against Nigel for the payment of attorneys' fees in the amount of $25,271.40.

o. On various dates in late January 2011 and February 2011, Robin caused an execution to be levied on Nigel's interest in the Fund against Peg Allison, Clerk of Court (11th Judicial District, Flathead County), Nigel, Viscomi, and herself as PR of the Estate. Notice of the sheriff's sale pursuant to the writ of execution was posted and published according to statute in Flathead County, Montana.

p. On May 3, 2011, Robin purchased, at the sheriff's execution sale, all of

---

[4] Ex. 16 is a copy of this Court's Judgment, of which the Court took judicial notice.

Nigel's rights, title and interests in and to the Trust Fund. Following a dispute as to the validity of the sheriff's sale, the state district court affirmed its validity by order dated February 8, 2012.1

q. Defendant Carroll previously represented Nigel in the marriage dissolution action. Nigel became indebted to Defendant Carroll for attorney's fees and costs which remain unpaid.

r. In an action in state court, 11th Judicial District, Flathead County, captioned DV-10-694B (the "Carroll Action"), Defendant Carroll obtained a confession of judgment against Nigel in the amount of $10,960.85, plus interest at 10%, which included a "voluntary lien" on recovery in the Estate's damages case. The state district court issued a writ of execution (the "first writ") on the judgment on or about November 19, 2010.

s. Michael A. Viscomi filed an affidavit in the Carroll Action on or about December 3, 2010, in which he detailed actual and potential competing claims against the Trust Fund.

t. Mr. Carroll had a levy officer serve the first writ on Viscomi personally on December 13, 2010.

u. On or about December 17, 2010, Carroll filed an Ex Parte Motion to Compel Delivery of Funds or in the Alternative for an Order to Show Cause and affidavit in support. On December 20, 2010, the state court issued an Order to Show Cause, requiring Viscomi to show cause why funds should not be delivered to Carroll.

v. On December 20, 2010, Robin filed in the Carroll Action a Notice of Lack of Subject Matter Jurisdiction and Applicability of Automatic Stay with Respect to any Determination of the Interests of Robin Cini.

w. On January 10, 2011, Carroll filed his Reply Brief in Support of Plaintiff's Lien.

x. The court issued a second writ of execution (the "second writ") respecting Carroll's judgment on or about June 30, 2011, on the basis of an affidavit filed by Carroll. Carroll caused the second writ to be served on Viscomi on June 30, 2011.

Other facts are gleaned from the testimony and exhibits admitted at trial.

Ex. 1 is the "7/29/09 Agreement" between Robin and Nigel described in the above-listed

fact "c." Robin hired Michael Viscomi ("Viscomi") to represent her in her capacities as PR of Hanna's estate and conservator of BC.  Viscomi testified that he represented Robin in negotiating Ex. 1, and Nigel was represented by attorney Jeffrey Ellingson ("Ellingson").  Ex. 1 provides at paragraph 4 that Viscomi and Ellingson would work out how they would divide the work in pursuing the wrongful death claims.  Viscomi testified that Ex. 1 has not been set aside and is still in effect.

Viscomi explained that Robin and BC each had individual claims, and Nigel had a derivative claim in the damages case.  The claim with the most potential recovery was the survivorship claim of Hanna, which Viscomi testified was owned equally by Robin and Nigel, and they also had claims for loss of companionship/loss of consortium which they agreed to treat pursuant to Ex. 1.

In Paragraph 3 of Ex. 1 Nigel agreed to assign the first $50,000 "of the net settlement of judgment proceeds payable to him pursuant to this agreement, shall instead be paid to Robin Cini, unless Nigel satisfies said $50,000, in whole or in part, by some other source of funds." Viscomi testified that Ex. 1 governs how net proceeds are to be divided, and that the state district court approved the allocation of funds under Ex. 1.  Ex. C is the state district court order dated August 11, 2009, approving the division of net settlement proceeds in accordance with Ex. 1.

Viscomi testified that any settlement funds usually go into his trust account, and he prepares closing statements such as Ex. 19, which he has clients sign before disbursing funds[5]. Carroll and Viscomi clashed on whether Viscomi gave false information on his closing

_____

[5]  Carroll's Ex. A, does not include Nigel's signature, which Viscomi testified he would require before disbursing funds.

statements.  Viscomi answered that Carroll's allegation that Viscomi did not give Carroll pertinent information regarding closing statements is "totally false." Viscomi asserted that he spent hours responding to Carroll's discovery requests, but that information pertaining to Robin's share of the Trust Fund was none of Carroll's business.  They also clashed on various interim closing statements, and Viscomi testified that he has a closing statement signed/accepted by Nigel, and that his copies are different than Carroll's.

Ex. 19 is a Viscomi & Gersh Trust Account Reconciliation which shows, and the Court finds, that at least $50,000 of the settlement funds have been transferred to Robin as required by the 7/29/09 Agreement, Ex. 1[6].  Robin testified that the $50,000 owed by Nigel under the 7/29/09 Agreement was part of an amount of $300,000 which Nigel was obligated to pay her from their marital dissolution property settlement agreement ("PSA"), and that in addition Nigel was obligated to pay her $3,000 per month over 21 months, to be appplied against the $300,000 and accrued interest.  She testified that Nigel paid her $3,000 for at least 4 months under the PSA.

Ex. F is an interim closing statement for an interim settlement of $25,000 from American Family Mutual Insurance Co., dated June 1, 2010, showing division of the settlement between attorney fees, costs, and net settlement disbursements.  Ex. F is not signed by Nigel or Ellingson.  Carroll asked Viscomi whether he got court approval to make the disbursements shown by Ex. F and Viscomi answered that he is not required to get court approval.

Ex. L is an interim closing statement dated November 15, 2010, for an interim settlement from Colony Insurance Company – Tri City Auto Wrecking in the amount of $100,000.  Ex. L is

---

[6] The column headed "Robin Trust" on Ex. 19 shows a distribution to Robin in the amount of $68,351.08 on 8/11/09, and other distributions including $32,085.98 on 10/5/09.

signed by Ellingson, and Viscomi testified that he paid Ellingson under their agreement in accordance with Ex. L.  Ex. L shows net proceeds of $54,000, and Viscomi testified that part of that would be divided.

Ex. AA is a supplemental interim closing statement dated December 20, 2010, sent by Viscomi to Hanna's estate showing the division of the $54,000 net proceeds from Ex. L.  Ex. AA shows $22,950.00 distributed to Robin and the same amount to Nigel, with both of those amounts held in trust by Viscomi pending court determination of appropriate disbursements between competing claimants, and $8,100 to the conservatorship of BC and held in trust to cover additional future costs and pending agreement between Robin and Nigel for the formation of a trust for BC.  Ex. AA is unsigned, and Viscomi testified that he did not get court approval of Ex. AA because it was not required.  Ex. C is a cost statement from Viscomi dated December 20, 2010, which includes an additional cost retainer in the amount of $6,000 allocated to Hanna's estate as of 11/15/10.

**Carroll's First Levy on Execution.**

Carroll testified that, after he withdrew as Nigel's counsel in the marital dissolution, he gave Nigel a bill for his fees.  He received a few payments from Nigel until November 2009, after which Nigel paid nothing.  Carroll asked Nigel for a confession of judgment, and Nigel signed one.  Ex. E is the confession of judgment dated May 13, 2010, which Carroll obtained against Nigel described in the above-listed fact "r" in the amount of $10,960.85.  On the second page of Ex. E, item 4 beginning at line 17, Nigel "voluntarily provides" Carroll a lien on proceeds awarded to Nigel in the probate and accident action.

On cross examination Carroll testified that Nigel gave him a consensual lien based on

contract.  However, Carroll testified that item 4 does not provide for the attachment or perfection of the lien.  Later, Carroll testified that Ex. E was equivalent to a security agreement, and that he used the judicial process to create an execution lien, as well as to accomplish attachment and perfection of the lien.

Carroll sent a copy of Ex. E to Ellingson, who represented Nigel in the accident case, and to Viscomi.  Viscomi testified that he first received a copy of Ex. E on June 14, 2010 when a letter Carroll sent to Ellingson was copied to Viscomi, and that he received another letter including Ex. E on November 10, 2010.  Viscomi had received a settlement in the amount of approximately $100,000 for the conservatorship and Hanna's estate.  Ex. L, described above, resulted in a net interim settlement of $54,000, but Ex. L shows that a subrogation lien on that amount was held by "BC/BS," which Viscomi identified as Blue Cross/Blue Shield.  Viscomi testified that he received a lien claim from BC/BS prior to receiving the settlement in Ex. L.

Carroll testified that he decided to have a writ of execution served after Nigel stopped making payments on the judgment.  Carroll explained that he felt he had to protect his claim for fees and did not want Nigel to leave without paying, so he moved to protect his judgment lien.  Ex. I is Carroll's first writ of execution dated November 19, 2010.

Viscomi testified that he first received Ex. I, and two other pages not included in Ex. I, by mail on November 29, 2010, Thanksgiving weekend.  He testified that no one in his office consented in writing to service of the writ by mail.  Christopher Yerkes ("Yerkes"), a process server who served Carroll's first lien, admitted that the first writ was served on Viscomi improperly by mail because Viscomi did not authorize in writing service by mail.  Viscomi testified that he received another copy of the same writ by personal service.

9

Yerkes personally served the writ on Viscomi and Ellingson[7].  Under questioning by the Court, Viscomi testified that he was served personally with Ex. I on December 13, 2010.  Carroll testified that his first writ of execution was not served on Nigel.

Robin filed her bankruptcy petition on November 19, 2010, after Carroll's first writ was mailed to Viscomi.  Notice of her bankruptcy, deadlines, and the automatic stay was mailed to creditors and parties on November 21, 2010, but not to Carroll.  She testified that Carroll is not a creditor in her bankruptcy.

Carroll testified that Robin filed notice of her bankruptcy and the automatic stay on December 21, 2010, in Carroll's lawsuit against Nigel.  Ex. EE.  On January 24, 2011, Robin filed motions in the same lawsuit asking the state court to abstain, and to compel Carroll to join all interested parties.  Ex. EE.

Carroll questioned Robin about her bankruptcy Schedules B and D (Ex. G and H, respectively[8]).  Ex. G lists Robin's interest in the probate case and her personal injury claims at items 20 and 21.  Ex. H lists Cogars as creditors with a secured claim marked as contingent, unliquidated and disputed.  Robin testified that her Schedule explains why Debtor believes Cogars are not secured.[9]

Carroll testified that his lien from Ex. E attached to Nigel's share of the accident and probate proceeds in the Trust Fund on December 13, 2010, by levy on execution of Carroll's first writ of execution by service on Viscomi, and that the lien also attached and was perfected

---

[7]  Yerkes did not know what Ellingson returned with respect to the writ.

[8]  Robin amended her schedules when she converted the case to Chapter 11.

[9]  Ex. H states that Cogars' lien is unperfected and voidable under 11 U.S.C. § 544(a).

10

simultaneously at the time of service of the writ on Viscomi.

Ex. I, the first Carroll writ of execution, states on page 2: "This writ expires within sixty days of the last date entered below." Viscomi believed, however, that the writ was good for 120 days, or until approximately March 19, 2011. Yerkes agreed that the writ lists itself as a 60 day writ, which would expire around January 19, 2011, but that under the statute the writ is good for 120 days. After a writ expires, Yerkes testified, he does a return of service for the issuing court.

Yerkes testified that the praecipe directed him to levy on any money or property held by Viscomi on behalf of Nigel, and not on property owned by anyone else. Viscomi agreed that Ex. I asks only for Nigel's property, and Viscomi agrees that it does not ask for property of Robin. Yerkes testified that, when he received Carroll's first writ, he tried to determine whether there were any other judgment liens against the property subject to the writ.

Viscomi testified that, when he received the first writ from Carroll, he researched the law and concluded that it would be appropriate to file an affidavit with the district court explaining why he could not respond due to competing claims. Yerkes testified that Viscomi did not deliver any money to Yerkes in response to service of Carroll's first writ, and that Viscomi replied to him that he wanted guidance from the court whether to disburse funds. Viscomi admitted that in his affidavits he claimed he was entitled to apply Nigel's funds and other funds in his trust account against his costs incurred of the ongoing litigation, but he chose not to. Paragraph 1 of Ex. 1 specifically states that the division of net proceeds among Robin, Nigel and their son is "after all applicable attorney fees, costs, or estate expenses are deducted."

Ex. 6 is a letter from Viscomi to Yerkes dated December 3, 2010, and Viscomi's

affidavit[10] filed in Cause No. DV-10-694B, explaining to the district court the competing claims against the Trust Fund and why Viscomi was reluctant to pay any of the Trust Fund to the levying officer under Carroll's first writ, until the district court ruled regarding disbursement. Viscomi had control of money in the Trust Fund at the time of the levies.  He testified that he filed similar affidavits in response to Carroll's second levy, and in response to Robin's writ of execution, as proof that he did not ignore any of the writs.

A show cause hearing was held on January 11, 2011, in the Carroll Action where Viscomi explained to the court the competing claims against the various settlements.  Viscomi testified that he did not interplead Nigel's funds because several liens existed against all interests.  Carroll questioned Viscomi why he made disbursements out of the Trust Fund earlier if there were liens, and Viscomi answered that he made disbursements to Cogars and Robin with the parties' permission or with court approval, including $7,885 from Nigel's funds paid to Robin under an agreement, which Viscomi testified included Carroll.[11]  Otherwise, Viscomi testified, he told the court in the Carroll Action that he would hold the funds.

Viscomi testified that he filed in the marital dissolution case on January 24, 2011, a response and affidavit requesting guidance from the court as to how $22,950.00 held in Viscomi's trust account for Nigel should be disbursed between the competing claimants.  Ex. W is the court's order dated September 30, 2011, in the Carroll Action, denying Carroll's motion to compel Viscomi to release and disburse funds.  The court discussed the competing claims

---

[10]  Another copy of Viscomi's affidavit dated December 6, 2010, is Ex. J, but Ex. J includes markings not on Ex. 6.

[11]  Carroll admitted agreeing to Viscomi's release of some funds to Robin.

exceeding the $42,000 held in Viscomi's trust account, Robin's bankruptcy and the automatic stay, and the court stayed any proceedings until this Bankruptcy Court's determination of the priority of the competing claims or the lawsuit comes to final judgment.

Yerkes testified that he never received any money from Viscomi in satisfaction of Carroll's first writ of execution. As a result, Yerkes did not issue a notice of seizure with respect to Carroll's first writ. Viscomi testified that no sheriff's sale was ever conducted on the basis of Carroll's first writ.

Yerkes prepared a return of service of the first Carroll writ, which he sent to Carroll. Ex. U is Yerkes' return on execution of the first writ, dated March 15, 2011. Ex. U states that Yerkes received $0 from Viscomi because the defendant has no funds. Yerkes testified that Viscomi had no funds because he was waiting for the district court to rule on his request for guidance. According to Yerkes, Carroll's first writ expired on or about March 15, 2011, and nothing was received.

Carroll admitted that he did not obtain a state court order extending either of his writs of execution. He testified his first writ expired after 60 days, and that he does not know how to continue a writ when it expires. Carroll's lien was never satisfied, and no sheriff's sale was ever conducted pursuant to Carroll's writs.

**Robin's Execution & Sale.**

Robin testified that she never received a bill or phone call from Carroll demanding that she pay for Carroll's judgment against Nigel. She further testified that Carroll did not ever lien her property or otherwise demand that she pay Nigel's debt. However, Carroll and Robin's attorney Cossitt were in communication. Carroll testified that he told Cossitt that he did not want

the Debtor's property, but that Cossitt "was yelling at me" for violating section 362, and Carroll did not appreciate it. Carroll testified that he sent Cossitt an email asking how he was violating § 362, and Cossitt said "figure it out for yourself."

Robin's attorney had Viscomi served with an execution,[12] which Viscomi testified he received on January 14, 2011. Yerkes served Viscomi with Robin's execution. Yerkes testified that he was not asked to seize any money from anyone in relation to Robin's writ. Ex. O is a response to the writ filed by Viscomi on January 24, 2011, asking the court in the marital dissolution case for guidance how to disburse $22,950.00 held in trust by Viscomi for Nigel, among competing claims of Robin, Cogars and Carroll. After January 2011, Viscomi admitted that he received one settlement in the accident litigation. Ex. L shows a receipt in the amount of $31,421.81 dated 5/17/11.

Yerkes testified that he did not seize any property in relation to Robin's writ of execution, and he did not prepare a notice of seizure. On re-cross examination, however, Yerkes testified that Robin's attorney prepared a detailed notice of seizure and it was served on "everyone."[13]

Carroll testified that he does not remember getting notice of Robin's writ of execution. Ex. 2 is a "Certificate of Sale of Personal Property" dated May 10, 2011, signed by a deputy sheriff. Ex. 2 states that the deputy sheriff levied on and sold at public auction "after due and legal notice" on May 3, 2011, at the lobby of the Justice Center of Flathead County, "All interests

---

[12] Robin's writ of execution was not offered into evidence. Cossitt explained that Plaintiff relies on the state court orders. A copy of Robin's execution and notice of levy is attached to Docket No. 162 as Ex. 5, but is not part of the instant record.

[13] Carroll then asked Yerkes whether the notice of seizure prepared by Robin's attorney described the property served, but Yerkes did not know. That notice of seizure was not offered.

of Nigel John Cini in the following actions, recoveries, proceeds or interests of any sort now pending in the 11th Judicial District of Montana: Cini v. Swartenburger, et al., DV-09-1488(A); and In the Matter of the Estate of Hanna M. Cini, deceased, DP-09-67A" to Cossitt on behalf of Robin for the sum of $3,141.35.

Jeff Weyh ("Weyh") is a civil clerk for the Flathead County Sheriff's Office.  He testified that he did not conduct the sheriff's sale, but that the date of the sale was established in email communications between Cossitt and the sheriff's office.  Weyh testified that he did not notify Carroll that the sheriff's sale was going to occur, and he did not do anything to determine whether any liens existed on the property sold at the sale.

Viscomi testified that, after the sheriff's sale, Robin's counsel sent him an email which stated that Robin is entitled to the property she purchased at sheriff's sale, and that her bankruptcy estate claims ownership of the funds held by Viscomi for Nigel as property of the estate.  Carroll testified that he does not know when he learned of the sheriff's sale of Nigel's property, but he estimated that he learned of the sale in early June of 2011, and that Nigel told him of the sale.

Robin amended her Schedule B after the sheriff's sale.  Her amended Schedule B[14] filed on June 14, 2011, provides "Amendment #1" at item no. 21 adding "claims formerly owned by Nigel but purchased by Debtor on 5/3/11 via sheriff's sale."  Robin's amended Schedule B was served electronically on Carroll via the Court's CM/ECF system.  She testified that she was asserting that Nigel's claims were property of her estate after the sheriff's sale.

An issue arose regarding the validity of Robin's execution because the sheriff's sale did

---

[14]  Docket No. 67 in Case No. 10-62715-11.

not take place within the 120-day statutory time limit of MONT. CODE ANN. § 25-13-402(1)(a). Robin moved for enlargement of time, and Nigel objected on July 29, 2011. Ex. BB. Nigel, pro se, challenged Robin's execution in the marital dissolution case and moved to declare her execution void. Ex. 3. Nigel objected to Robin's attempt to enlarge the time for concluding the sheriff's sale, arguing that Robin's writ did not include a supporting affidavit and had expired by the time of the sheriff's sale. On the third page of Ex. 3, dated July 29, 2011, beginning on the fourth line Nigel[15] wrote: "A writ has no value after it expires. The writ cannot be enforced after it expires." No evidence exists in the record that Carroll attempted to intervene in the marital dissolution case to challenge the sheriff's sale.

Ex. 4 is Judge Lympus's findings, conclusions, and orders in DR-08-483-A, dated February 8, 2012. The court found that Robin's writ was properly issued, served on Nigel and executed, the notice of sheriff's sale was properly posted, and the court extended "any time limit in § 25-13-402, MCA," and approved the judicial sale of Nigel's interests. Ex. 4. Carroll testified that Nigel's was not granted a hearing on his objection, but the court denied Nigel's motion for hearing. Ex. 4.

For purposes of the instant adversary proceeding, Ex. 4 provides at conclusion of law no. 5 on page 4: "When levy of the execution on Nigel occurred, on 1/24/11, the levy created an Officer's Lien in favor of the officer who levied, § 71-3-1503,[16] MCA and the lien continued

---

[15]  Although Carroll no longer formally represents Nigel, in other contested matters in this adversary proceeding Nigel testified that, after he gave Carroll the confession of judgment in the Carroll Action, Nigel continued to go to Carroll's office to ask for legal advice, and that Carroll provided him with legal advice and guidance. Dkt. 157, pp. 2-3

[16]  Montana Code Annotated ("MCA") § 71-3-1503 provides: "Officer's lien. An officer who levies an attachment or execution upon personal property acquires a special lien, dependent

until the judicial sale occurred."

Ex. 4 further sets forth conclusion of law no. 12 on pages 5-6:

12.  As a result of the judicial sale and the issuance of the Certificate of Sale by the Flathead County Sheriff, this Court concludes:

a.  that Nigel Cini was and is divested of all right and title to the property described in the Certificate; and

b.  ownership of the property described in the Certificate has been transferred to Robin effective as of the date of the Sale Certificate.

Ex. 4.

Nigel appealed the decision to the Montana Supreme Court.  The Montana Supreme Court affirmed the district court by memorandum opinion dated October 16, 2012, concluding that Nigel "has not established that the alleged errors on the part of the District Court caused him substantial prejudice."  Ex. 5 is the decision of the Montana Supreme Court, and ¶ 5 of the opinion provides:

Based on § 71-3-1503, MCA, the District Court concluded that when the levy of the execution on Nigel occurred (on January 24, 2011), the levy created an officer's lien in favor of the officer who levied and the lien continued until the judicial sale occurred. Thus, an enlargement of time was unnecessary to comply with this statute. Furthermore, applying the standards set forth in *Pesarik v. Perjessy*, 2008 MT 337, ¶ 22, 346 Mont. 236, 194 P.3d 665, the District Court concluded that the delay in the execution sale was not the result of forgetfulness, Robin's schedule, inattentiveness to the matter, or lack of understanding the Rules of Civil Procedure, but was instead the result of the Sheriff's Office not having the ability or resources to conduct the sale until May 3, 2011. The District Court observed that Robin had acted with good faith, diligence, and fairness in setting up and scheduling the sale, which ultimately occurred "a mere 13 days beyond the expiration of the time period" in § 25-13-402, MCA. Moreover, the District Court noted that no party had been harmed or injured, or had even alleged harm or injury, due to the delay. Finally, the District Court observed that Nigel had failed

on possession, upon that property, which authorizes the officer to hold it until the process is discharged or satisfied or a judicial sale of the property is had."

to respond to the Notice of Levy in a timely manner, and thus his present objections were untimely. Accordingly, the District Court granted Robin's motion for enlargement of time under Rule 6(b) and extended the time to conduct the sale until May 3, 2011. Because the sale was conducted by that date, the District Court held that "[t]he Certificate of Sale of Personal Property is valid, confirmed, approved and adopted by the Court as binding for all purposes and is enforceable as a conveyance document."

Ex. 5, pp. 3-4.

Viscomi testified that the Montana Supreme Court decision satisfied him with respect to the state court, but that he continued to hold the Trust Funds pending this Court's decision on the respective interests of the parties. Viscomi did not utilize interpleader rules under either state or federal law to place the disputed funds under the control of the court.[17] *See, e.g.,* F.R.B.P. 7022 (Applying Rule 22, Fed. R. Civ. P. ("Interpleader") in adversary proceedings).

**Carroll's Second Levy on Execution.**

Carroll testified that, after he learned of the sheriff's sale of Nigel's interests to Robin, he learned that Viscomi had received new money, and he moved to protect his lien against the new funds. He obtained a second writ of execution, Ex. V, issued by the clerk of court in DV-10-694(B) dated June 30, 2011. It states that the amount due as of June 28, 2011, is $11,133.60. The docket in Case No. 10-62715 does not show that Carroll ever filed a motion for relief from the automatic stay under 11 U.S.C. § 362(d), and this Court has not granted Carroll relief from the stay.

Viscomi testified that he received Carroll's second writ of execution by personal service on June 30, 2011. Viscomi responded to the second writ on July 1, 2011, by another affidavit.

---

[17]  Under questioning by the Court about interpleading the funds, Viscomi testified that he considered interpleader but was "not comfortable" with that.

18

Viscomi testified that he never received notice of a sheriff's sale related to Carroll's second writ, and never received a court order extending the second writ.

On cross examination, Viscomi testified that Carroll has not ever demanded from Viscomi money or property owned by Robin.  Carroll testified that both writs of execution he obtained were against Nigel's property, and Nigel was not in bankruptcy.  Carroll and Robin attempted to reach a settlement, but were unable to finalize any resolution.[18]

**Pending Settlement with MDOT and McGunagle.**

David Sandler ("Sandler") represents Robin in the state court damages case.  He testified that a mediation was conducted before mediator Dennis Lind, at which the parties appeared, and a settlement was reached with two of the defendants, the Montana Department of Transportation ("MDOT") and William McGunagle ("McGunagle").  The MDOT offered Robin the sum of $320,000 and McGunagle offered $25,000 in settlement.  Ex. 18.  Sandler advised Robin to accept the settlement.  Ex. 20 is Viscomi's closing statement showing the allocation of those 2 settlements to fees and costs, with $109,780.67 to be held in trust pending a court determination of proper disbursement between the parties.

Robin filed a motion to approve the compromise on March 4, 2013.  Carroll filed the only objection on March 12, 2013, to the extent that the settlement proposes to disburse funds from the Trust Fund "which are subject to Mr. Carroll's prior perfected lien."  Carroll called no

---

[18]  Carroll made an offer of proof that, after the Montana Supreme Court entered its decision affirming the district court's decision (Ex. 4), he received an email from Cossitt adding additional conditions for settlement, and the next day he told Cossitt "no."  Carroll made the offer of proof on the grounds it is relevant to whether Robin unnecessarily extended the dispute. The Court noted Carroll's offer of proof on the record.  It plays no role in this Decision.  Robin testified on rebuttal that Carroll refused to reduce his demand for full payment.  That also plays no role in this Decision.

witnesses at the trial, and did not offer any testimony or other evidence in opposition to approval of the proposed settlement other than his claim to a perfected lien in the proceeds.

Sandler testified that he recommended that Robin accept the settlement offers from MDOT and McGunagle because the net economic recovery from the settlements would be greater than if Robin proceeded to trial against the MDOT and McGunagle, primarily because of the costs which Robin would incur by going to trial.

Sandler testified that, after the settlement was reached with MDOT and McGunagle, an issue remained regarding dividing up the proceeds between Robin as DIP, Robin as PR of Hanna's estate, and as conservator of BC. Sandler testified that he analyzed the division of proceeds following generally accepted methodology for dividing proceeds, based on what would happen at trial if a jury was instructed to divide the proceeds. Sandler and Viscomi both explained that the damages for the survivorship action of Hanna's estate would be larger in amount than the damages available to Robin personally and as conservator of BC, because the survivor claim would include a loss of Hanna's lifetime earning capacity. Robin's personal injury claim in turn is larger than her son's because she had more serious physical injuries and emotional distress.

Sandler testified that he arrived at a division of proceeds as follows: 62 percent (62%) to Hanna's estate; 22% to Robin; and 16% to Robin as conservator of BC. Sandler testified that he presented the question of division of proceeds to a mock jury, and that the mock jury[19] came back with a similar allocation.

---

[19]  Ex. 24 reflects costs incurred by co-counsel attorney Jeffrey Ellingson in relation to the mock jury.

Ex. 17 is the settlement agreement between Viscomi & Gersh, Robin as DIP, Hanna's probate estate and Robin as BC's conservator, dated February 28, 2013.  Viscomi testified that he was not willing to consider entering into the settlement agreement until the bankruptcy court entered its decision that Nigel had no interest in the estate or this adversary proceeding.[20]  Ex. 18 provides the allocation in dollar amounts as $245,000 to Hanna's estate, $60,000 to Robin and $40,000 to BC's conservatorship.  Ex. 22 shows allocation of joint costs, which benefitted all 3 clients, in accordance with the same allocation used for proceeds.

The proposed settlement does not include amounts still sought to be recovered from other defendants which Sandler identified at trial.  Viscomi testified that they will continue to pursue recovery from the remaining defendants and, while he has not negotiated the allocation of future awards with Sandler, he expects that the allocation of future proceeds will continue as in Ex. 18.  Ex. 25 includes $2,200 in future costs, which Sandler explained was an estimate of costs expected to be incurred in pursuing the claims against the non-settling accident defendants.  Ex. 23 and 24 include costs for attorneys and other professionals who have not been reimbursed yet.  Viscomi testified that it is reasonable to continue to incur costs in the litigation at least until the state court makes a decision on insurance coverage.

Ex. 19 is Viscomi & Gersh's Trust Account Reconciliation, which Viscomi's bookkeeper prepared.  Ex. 19 shows $22,950 held for "Robin Trust," which Viscomi testified was not in dispute, $9,224.19 held under "Nigel Trust," and $11,659.54 under "Disputed Funds."  Viscomi testified that he was still holding the funds because this Court had not ruled on Nigel's interest,

---

[20]  That decision was entered in this adversary proceeding on February 25, 2013.  Dkt. 172, 173.

and that Nigel's account and the "Disputed Funds" account both should now be $0.

Addressing the four factors from *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1380-81 (9th Cir.) *cert. denied sub nom. Martin v. Robinson*, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed. 2d 122 (1986), to evaluate in determining whether a settlement is fair and equitable, Sandler testified that, with respect to McGunagle, a low probability of success exists on the merits and a jury would be unlikely to find McGunagle liable, so the $25,000 offer from McGunagle is in Sandler's opinion reasonable.

With respect to MDOT, Sandler testified that some probability of success exists on the claim against MDOT for highway design defect.  However, he further testified that MDOT has a defense of comparative negligence by the Schwartz defendant in the accident case, which in his opinion would reduce the amount of MDOT's liability.  Viscomi, who testified that approximately half his work is plaintiffs' work, testified that proceeding with litigation against the MDOT would include a high risk of zero recovery.  Viscomi agreed with Sandler that the Schwartz defendant's liability is greater, and Viscomi testified that the MDOT has never lost a highway design defect case.  Viscomi testified that focus groups reported their opinion that the MDOT would have a 25 and 1/3 percent liability.

The second *A&C* factor is the difficulties which may be encountered in collection. Sandler testified that no difficulty in collection will occur from either McGunagle or the MDOT because McGunagle is insured and MDOT is an arm of the State of Montana.

The third *A & C* factor is the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it.  Sandler testified that the remaining accident litigation is very complex and likely will take a long time to resolve because of the multiple

22

parties involved and the necessity to allocate responsibility among the parties to the accident. Viscomi agreed.  Sandler testified that he is amending the complaint in the accident litigation against the remaining defendants.  He explained that he is representing the estate on a contingency fee basis, and he thinks that the remaining claims are worth pursuing.

The fourth *A & C* factor is the paramount interest of creditors and a proper deference to their reasonable views.  Sandler testified that the proposed settlement is very reasonable for the creditors because it produces funds immediately for administration under the Debtor's Plan, compared with the time and expense which will be required for litigation, including the inherent risk of losing any litigation.  Carroll is not a creditor in Robin's case.

Carroll did not cross examine Sandler, so his testimony is uncontroverted.  Viscomi also recommended that Robin accept the settlement.  He testified that Robin's creditors have no claims against Hanna's probate estate, so her creditors are not a consideration.  In addition, Viscomi testified that approval of the proposed settlement by a total of four courts is needed.  First this Court would have to approve the settlement; second approval of the court hearing the probate of Hanna's estate; third is the court in the conservator action; and fourth, the MDOT requires approval by the district court in the wrongful death action before the MDOT will pay.

Viscomi testified that he has enough funds in his trust account to pay Carroll's lien in full plus interest.

## DISCUSSION

One matter which can be dispensed with quickly, based on the rules, is Carroll's request for attorney fees, which he argues is included under the "Relief Sought" portion of the Pretrial Order, p. 8, is included in the prayer of his answer, and is allowed under state law.  Cossitt

23

objected that Rule 7008 precludes an award of attorney fees because it was not separately

pleaded.  At the trial the Court sustained Cossitt's objection based upon Rule 7008(b), F.R.B.P.,

which provides:  "(b) Attorney's Fees.  A request for an award of attorney's fees shall be pleaded

as a claim in a complaint, cross-claim, third-party complaint, answer, or reply as may be

appropriate."  Carroll did not plead his request for attorney fees as a claim or counterclaim in his

answer, so the Court denied Carroll's request for attorney fees at trial.  The Court here reaffirms

that denial based on Rule 7008(b).[21]  Although pro se, Carroll is a practicing attorney.  In the

Ninth Circuit, pro se litigants are not excused from compliance with the rules.  *Warrick v.*

*Birdsell*, 278 B.R. 182, 187 (9th Cir. BAP 2002); *see also King v. Atiyeh*, 814 F.2d 565, 567 (9th

Cir. 1987) ("Pro se litigants must follow the same rules of procedure that govern other

litigants.").

### A.  Counts I and III – Determination of Validity & Priority of Carroll's Lien.

Counts I and III call for a determination of the validity and priority of Robin's and

Carroll's respective interests and/or liens.  Robin argues that Carroll's writs of execution expired

under Montana law and are of no effect, and that the sheriff's sale of Nigel's interest on May 31,

2011, is entitled to preclusive effect under the doctrines of law of the case, issue preclusion and

claim preclusion[22] based on the decision of the Montana Supreme Court affirming the district

court.

Carroll argues that his judgment and voluntary lien is a valid, attached, and perfected

---

[21]  Since Robin prevails on the merits under Counts I and III, Carroll would not have been entitled to an award of attorney fees in any event.

[22]  The Court denied Cossitt's oral motion, made at trial prior to the first witness, to apply the doctrines of law of the case, issue preclusion, and claim preclusion.

security agreement by virtue of the levy on execution of the writ by personal service upon

Viscomi.  Carroll cites MCA § 25-13-501 as authority to find attachment and perfection of his

lien.  Carroll refers to the Cogar defendants' lien, argues that Robin was fully paid for the initial

$50,000 required under Ex. 1, and that Robin's judgment required payment of attorney fees

directly to Robin's attorney, not to her.  Carroll argues that Robin offered no evidence that she

provided notice to Carroll of the sheriff's sale or other execution on Nigel's interests in the Trust

Fund, so she cannot upset Carroll's prior claim.  He argues that issue preclusion cannot defeat his

prior perfected lien because she did not provide him with notice of the execution.

The Montana Supreme Court set out a four part test that must be met for res judicata or

claim preclusion to apply in *In the Matter of B.P. and A.P.*,2001 MT 219, ¶ 14, 306 Mont. 430,

433, 35 P.3d 291, 294:  "[T]he parties or their privies are the same; the subject matter of the claim

is the same; the issues are the same and relate to the same subject matter, and the capacities of the

persons are the same in reference to the subject matter and the issues."  In the instant case, the

issues regarding Carroll's liens against Nigel's interest in the Trust Fund, and whether his liens

survived the sheriff's sale, have similarities but are not the same as when Nigel challenged the

sheriff's sale.  Therefore, this Court will not apply the doctrine of res judicata or claim preclusion

against Carroll's lien.

As to Robin's request to apply issue preclusion, or collateral estoppel, the test in Montana

to apply collateral estoppel is stated in *In re Estates of Swanson*, 2008 MT 224, ¶ 16, 344 Mont.

266, 187 P.3d 631:

> (1) the issue decided in the prior adjudication is identical with the one presented
> in the action in question;
> (2) there was a final judgment on the merits; and
> (3) the party against whom collateral estoppel is asserted was a party or in privity

with a party to the prior adjudication;

*In re Houston*, 2008 WL 5971043 (Bankr. D. Mont. 2008); *see also Safeco Inc. Co. of America v. Liss*, 2000 MT 380, ¶¶ 45, 46, 48, 51, 303 Mont. 519, ¶¶ 45, 46, 48, 51, 16 P.3d 299, ¶¶ 45, 46, 48, 51.

Here, the evidence shows a final decision by the state court in the marital dissolution case approving the sheriff's sale, Ex. 4, which was affirmed by the Montana Supreme Court in Ex. 5. Under Rule 201, Fed. R. Evid., courts may take judicial notice of undisputed matters of public record, including documents on file in federal or state courts. *Harris v. County of Orange*, 682 F.3d 1126, 1131-32 (9th Cir. 2012); *see Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002). Carroll objected to Ex. 5 because it is marked "Not for Publication." However, that does not preclude this Court from taking judicial notice of the decision under Ninth Circuit authority, and the Court already admitted Ex. 5 in this adversary proceeding for purposes of Robin's third motion for summary judgment. "[W]e 'may take notice of proceedings in other courts, both within and without the federal judicial systems, if those proceedings have a direct relation to matters at issue.'" *Bennett v. Medtronic, Inc.*, 285 F.3d at 803 n.2 (quoting *United States ex rel. Robinson Rancheria Citizens Council v. Borneo*, 971 F.2d 244, 248 (9th Cir. 1992).

The Montana Supreme Court's decision in Ex. 5 affirming Judge Lympus' order approving the sheriff's sale both clearly have a direct relation to the matters at issue in this adversary proceeding, because Carroll's alleged liens are against Nigel's interest in the Trust Fund of which Robin claims ownership by sheriff's sale. Therefore, this Court takes judicial notice of Ex. 5.

As to whether the sheriff's sale was conducted properly based on the expiration of time,

or notice, or who was entitled to execution on the judgment for attorney fees, or whether Robin

complied with the Montana statutes governing execution and sale, whether or not this Court

chooses to apply issue preclusion the Court finds and concludes that Carroll's arguments against

the validity of the sheriff's sale are barred by the law of the case.

> Under the law of the case doctrine, a prior Montana Supreme Court decision
> resolving an issue between the same parties is binding and may not be relitigated.
> *In re Estate of Snyder*, 2009 MT 291, ¶ 6, 352 Mont. 264, 217 P.3d 1027; *Murphy
> Homes, Inc. v. Muller*, 2007 MT 140, ¶ 56, 337 Mont. 411, 162 P.3d 106; *Muri v.
> Frank*, 2003 MT 316, ¶ 11, 318 Mont. 269, 80 P.3d 77. This doctrine " 'expresses
> the practice of courts generally to refuse to reopen what has been decided.' "
> *Murphy Homes*, ¶ 56 (quoting *Fiscus v. Beartooth Elec. Coop.*, 180 Mont. 434,
> 436, 591 P.2d 196, 197 (1979)). Like res judicata, the law of the case doctrine is
> based on policies of judicial economy and finality of judgments. *Muri*, ¶ 11.

*State v. Wagner*, 2013 MT 47, ¶ 18, 369 Mont. 139, 296 P.3d 1142.

Carroll seeks to collaterally attack the state court decision, which was affirmed by the

Montana Supreme Court, in this adversary proceeding.  But those decision are final, and under

the law of the case this Court declines to reopen what has been decided with respect to the

validity of the sheriff's sale.

A common maxim of equity is:  "The law helps the vigilant before those who sleep on

their rights."  MCA § 1-3-218; *Anderson v. Stokes*, 2007 MT 166, ¶ 21, 338 Mont. 118, 163 P.3d

1273.  This is not a case where both sides conducted sheriff's sales against the same property.

Carroll served a writ of execution before Robin did, but Carroll did not exercise his right to have

Nigel's interest in the Trust fund sold by judicial sale.  Robin purchased Nigel's interests at a

sheriff's sale, which was approved and affirmed in a final decision by the Montana courts.

Carroll argues that he did not receive notice of Robin's execution or sheriff's sale.

However, his own witness Yerkes testified that Robin's attorney prepared a detailed notice of

27

seizure and it was served on "everyone."  Carroll testified that he does not remember getting

notice of Robin's writ of execution.  That is not evidence that Carroll did not receive notice.

Carroll argues that the state court decisions affirming Robin's sheriff's sale of Nigel's

interest should not affect his lien because he was not a party and did not receive notice.  The

evidence shows, however, that Carroll slept on his rights.  Carroll testified that Nigel told him

about the sheriff's sale approximately in early June.  Nigel filed Ex. 3 in opposition to Robin's

motion to enlarge time for the sheriff's sale on July 29, 2011.  The district court did not enter its

decision in Ex. 4 until February 8, 2012.  Carroll thus had ample time to request relief from the

stay and move to intervene in the marital dissolution case, in which he earlier represented Nigel,

protect his interest and pursue his arguments against the validity of Robin's sheriff's sale at the

same time Nigel did.  Carroll slept on his rights instead of acting to protect his interests.  The

sheriff's sale was affirmed, and this Court will not now grant Carroll relief to collaterally attack

the sheriff's sale at which Robin purchased Nigel's interests under state law to a final decision.

Section 541(a) of the Bankruptcy Code broadly defines "property of the estate" to include

"all the following property, wherever located and by whomever held:"

> (1) . . . all legal or equitable interests of the debtor in property as of the
> commencement of the case.

* * * *

> (7) Any interest in property that the estate acquires after the commencement of the
> case.

Sections 1306(a)(1) and 1115(a)(1) both provide that property of the estate under those

chapters includes, in addition to the property specified in § 541, all property that the debtor

acquires after the commencement of the case.

28

In discussing the broad definition of "property of the estate", this Court wrote:

Section 541(a)(1) of the Bankruptcy Code is intended to include in the estate "all legal or equitable interests of the debtor in property as of the commencement of the case." *In re Campbell (Balyeat Law Offices v. Campbell)*, 14 Mont. B.R. 132, 140-41 (9th Cir. BAP 1995). In *Campbell* the BAP wrote:

> The legislative history indicates that the scope of § 541(a)(1) is broad. *See United States v. Whiting Pools, Inc.*, 468 U.S. 198, 205 (1983). Section 541(a)(1) is intended to include in the estate any property made available to the estate by any other provisions of the Bankruptcy Code. *Id.* (citing H.R. Rep. No. 95-595, p. 367 (1977)). Several provisions in the Code permit the trustee to recover property in which the debtor did not have a possessory interest when the bankruptcy petition was filed. *See, e.g.,* 11 U.S.C. §§ 543, 544, 547 & 548; *Whiting Pools,* 462 U.S. at 205. Thus, "[a]n estate in bankruptcy consists of all the interests in property, legal and equitable, possessed by the debtor at the time of filing, as well as those interests recovered or recoverable through transfer and lien avoidance provisions." *Owen v. Owen*, 500 U.S. 305, 308 (1991).

*In re Weatherwax*, 16 Mont. B.R. 304, 308-09 (Bankr. D. Mont. 1997).

To determine the parties' respective interests in Nigel's share of Trust Funds, the Court must examine state law because state law determines the extent of a party's interests in property and when such interests expire. *In re Contractors Equip. Supply Co.*, 861 F.2d 241, 244 (9th Cir. 1988); *see also Nobelman v. Am. Savings Bank*, 508 U.S. 324, 329 (1993) ("In the absence of a controlling federal rule, we generally assume that Congress has 'left the determination of property rights in the assets of a bankrupt's estate to state law,' since such '[p]roperty interests are created and defined by state law.' *Butner v. United States*, 440 U.S. 48, 54-55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). *See also Barnhill v. Johnson*, 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992)").

Based on Ex. 4 and 5, applying the law of the case to refuse to reopen what has been

29

finally decided, and based on policies of judicial economy and finality of judgments, *State v. Wagner*, 2013 MT at ¶ 18, this Court finds that Robin is the sole owner of Nigel's interests in the Trust Fund held by Viscomi, after she purchased them at the sheriff's sale.

Carroll had the same right of execution and sale under Montana law as Robin had, and Carroll accomplished his levy on execution of his first writ before Robin.  However, he failed to complete the sale on execution before the 120-day time limit of § 25-13-402(1)(a), which requires the sheriff or levying officer to execute the writ against the property of the judgment debtor not later than 120 days.  It is of no help to Carroll that Robin also did not complete the sheriff's sale within 120 days, because Robin moved for an extension of time, the district court granted the extension (Ex. 4, p. 6), and the Montana Supreme Court affirmed (Ex. 5).  Carroll never scheduled a sheriff's sale in execution of his judgment, never moved for an extension of the 120-day period of § 25-13-402(1), and he cannot now schedule a sale both because of the automatic stay of 11 U.S.C. § 362(a) after Robin purchased Nigel's interest, and because his first writ expired in mid-March of 2011 after 120 days.

Carroll contends that his execution lien against Nigel's interest in the Trust Fund survives and takes priority over Robin's interest as purchaser at the sheriff's sale because he obtained his lien first.  Such a result would require that this Court ignore the 120 day time limit of § 25-13-402(1)(a).

This Court operates under the presumption that the legislature does not pass meaningless legislation, and the Court will harmonize statutes relating to the same subject in order to give effect to each statute.  *State v. Brendal*, 2009 MT 236, ¶ 18, 351 Mont. 395, 213 P.3d 448 (citing *Oster v. Valley Co.*, 2006 MT 180, ¶ 17, 333 Mont. 76, 140 P.3d 1079); *Yellowstone Federal*

*Credit Union v. Daniels*, 2008 MT 111,¶ 18, 342 Mont. 451, 181 P.3d 595.  Courts generally

avoid construing one provision in a statute so as to suspend or supersede another provision.  *Rake*

*v. Wade,* 508 U.S. 464, 471-72, 113 S.Ct. 2187, 2192, 124 L.Ed.2d 424 (1993).  In *Heuther v.*

*Dist. Ct.*, *Heuther v. Dist. Ct.*, 2000 MT 158, ¶ 28, 300 Mont. 212, 220, ¶ 28, 4 P.3d 1193, 1198,

¶ 28 (1999) (concurring and dissenting opinion), the court wrote:

> When a statutory scheme has several provisions, a construction is to be adopted
> which will, if possible, give effect to all.  Section 1-2-101, MCA.  A statute
> dealing with a particular subject will control over a general statute which is
> inconsistent with it.  Section 1-2-102, MCA, and *Mead v. MSB, Inc.*, (1994), 264
> Mont. 465, 474, 872 P.2d 782, 788.  In particular, "whenever there are differing
> possible interpretations of [a] statute, a constitutional interpretation is favored
> over one that is not."  *Department of State Lands v. Pettibone* (1985), 216 Mont.
> 361, 374, 702 P.2d 948, 956.

The district court and Montana Supreme Court each noted that Robin's judicial sale was

conducted within the time set forth in § 71-3-1503.  That is puzzling, because § 71-3-1503

contains no time limit:  "Officer's lien.  An officer who levies an attachment or execution upon

personal property acquires a special lien, dependent on possession, upon that property, which

authorizes the officer to hold it until the process is discharged or satisfied or a judicial sale of the

property is had."  Section 25-13-402(1)(a) has a specific time limit, 120 days, within which the

sheriff or levying officer "shall" execute the writ by levying and selling property to satisfy the

judgment.  Section 71-3-1503 does not have a specific time limit[23].

Therefore, in this Court's view applying basic statutory construction, § 25-13-402(1)(a) is

the more specific statute, and in order to harmonize the two statutes the officer's lien under § 71-

---

[23]  The Court's research of § 71-3-1503 turned up no Montana case law construing § 71-3-1503, except for the Montana Supreme Court's memorandum decision, Ex. 5, which by its terms "shall not be cited and does not serve as precedent."

3-1503 must be deemed to expire and the process "discharged" after 120 days.  *State v. Brendal*, 2009 MT 236, ¶ 18.  Carroll's first writ of execution expired after 120 days on or about March 15, 2011, according to Yerkes.  The sheriff's sale took place on May 3, 2011.  Thus, it makes no difference whether or not Robin notified Carroll of the execution sale because his officer's lien or "execution lien" expired before the sale.

*In re Marriage of Miller*, 206 Mont. 515, 518-19, 672 P.2d 271, 273 (1983) mentions the term "execution lien."  However, that reference is to a writ of special execution by a district court in the division of real property during a marital dissolution, in which the court restricted the "execution liens" and limited the husband's right to enforce a money judgment in his favor in order to further the intention of the court.  The use of the term "execution lien" in *Miller* did not, in this Court's reading, create a judge-made "execution lien."  Rather, the lien in *Miller* arose by operation of statute, Mont. Code Ann. § 25-9-301(2), in which from the time a judgment is docketed it becomes a lien on all real property of the judgment debtor.  The instant case does not involve real property.

In *In the Estate of Bolinger*, 1998 MT 303, ¶ 76, 292 Mont. 97, ¶ 76, 971 P.2d 767, 789-80, ¶ 76, the Montana Supreme Court reversed a district court's creation of a lien against personal property, following reference to the lien on real property provided under § 25-9-301(2) with the following:  "With regard to personal property, which, unlike real property, is not referred to in the statute as subject to a lien immediately when a judgment is docketed, a lien does not arise prior to execution on that property.  For these reasons, we reverse the District Court's creation of a lien against the personal property of the ranch."  *Bolinger* at ¶ 76.

Section 25-9-301(2) does not create a lien in personal property.  Carroll cites no other

32

statute in Title 25, Chapter 13, which creates a lien in personal property by entry of a judgment, and this Court is aware of none.  Carroll does cite § 25-13-501 as authority that his security interest granted in Ex. E attached and was perfected by his levy on execution of his first writ. The language of § 25-13-501 provides no support for that contention:

> What property subject to execution: All goods, chattels, moneys, and other property, both real and personal, or any interest therein of the judgment debtor, not exempt by law, and all property and rights of property seized and held under attachment in the action are liable to execution.  Shares and interest in any corporation or company, debts and credits, and all other property, not capable of manual delivery, may be attached on execution, in like manner as upon writs of attachment.  Gold dust must be returned by the officer as so much money collected, at its current value, without exposing the same to sale.  Until a levy, property is not affected by the execution.

§ 25-13-501.

No evidence exists in the record that Carroll sought or accomplished attachment of Nigel's interest in the Trust Fund prior to the confession of judgment.[24]  Nigel's interests were subject to execution under § 25-13-501, and that section provides that until the levy property is not affected by the execution.  However, nothing in § 25-13-501 supports Carroll's argument that the levy of his first writ accomplished attachment and perfection of his voluntary security interest.

Carroll conflates principles of attachment and perfection of security interests applicable to secured transactions under Montana's Uniform Commercial Code, Title 30, Chapter 9A, to execution of his judgment under Title 25.  Aside from running afoul of the above-cited case law preferring more specific statutes pertaining to execution of judgments described in the instant case, the UCC itself provides several subsections that specifically preclude application of the

---

[24]  Prejudgment attachment is governed by Chapter 18 of Title 27, MCA.

UCC to Carroll's lien.

Section 30-9A-201(4)(b) provides: "This chapter does not: . . . (b) extend the application of the rule of law, statute or regulation to a transaction not otherwise subject to it." Section 30-9A-109 provides two specific exceptions to the scope of the Chapter 9. Section 30-9A-109(3)(b) provides: "This chapter does not apply to the extent that: . . . (b) another statute of this state expressly governs the creation, perfection, priority, or enforcement of a security interest created by this state or a governmental unit of this state." Section 30-9A-109(4)(g) provides: "This chapter does not apply to . . . (g) an assignment of a single account, payment intangible, or promissory note to an assignee in full or partial satisfaction of a preexisting indebtedness."

Ex. E provides that the voluntary lien granted to Carroll "is due for legal services rendered to plaintiff in the action described above." Under any or all of these subsections, in this Court's view the UCC does not apply to Carroll's voluntary lien, and his arguments regarding attachment and perfection of his lien granted in the confession of judgment, Ex. E, are not persuasive. Carroll's relationship with Nigel was a professional relationship as attorney-client in a divorce case, not a commercial transaction.

As a result, the officer's lien in favor of Carroll pursuant to § 71-3-1503 expired after 120 days under § 25-13-402(1)(a), when Carroll failed to accomplish a sheriff's sale. Pursuant to state court orders, Ex. 4 and 5, Robin purchased all of Nigel's rights and interests in and to the Trust Fund at the sheriff's sale. Carroll slept on his rights and relied on his first execution. When Carroll eventually attempted to levy on execution of his second writ, that was void because Nigel's interests had become property of the Robin's estate. Actions taken in violation of the automatic stay are void, not merely voidable. *In re Gruntz*, 202 F.3d 1074, 1082 (9th Cir.

34

2000); *In re Deines*, 17 Mont. B.R. 114, 115 (Bankr. D. Mont. 1998); *Hillis Motors, Inc. v. Hawaii Auto Dealers' Assoc.*, 997 F.2d 581, 586 (9th Cir. 1993).

Carroll contends that his lien survived and attached to new proceeds in the Trust Fund. That contention fails because Robin purchased all of Nigel's interests in the Trust Fund at the sheriff's sale.  Ex. 4, 5.  Carroll's lien granted in Ex. E applied only to Nigel's interest, and with all of Nigel's interest now property of the estate Carroll has no basis to make a claim against new funds paid to the Trust Fund.

As Debtor-in-Possession, Robin has rights and powers of a trustee under 11 U.S.C. § 1107(a).  Thus, Robin has "strong arm" powers under 11 U.S.C. § 544(a)(1), including the rights and powers of a judicial lien creditor on all property on which a creditor on a simple contract could have obtained such a judicial lien.  Section 544(a)(1) allows a trustee in bankruptcy to avoid unperfected interests in personal and real property.  *In re Goettel*, 16 Mont. B.R. 27, 33 (Bankr. D. Mont. 1997).  Carroll's officer's lien expired.  His voluntary lien by virtue of Ex. E was not perfected by levy under § 25-13-501, or under the UCC, and if it had been perfected that perfection would have expired with the execution after 120 days.  Carroll's voluntary lien is unperfected, and if it had survived the sheriff's sale, which this Court believes it did not because Carroll slept on his rights, it would be avoidable under § 544(a)(1).  Robin is entitled to judgment under Courts I and III that Carroll has no lien or interest in the Trust Fund.

### B.  Settlement with MDOT and McGunagle.

Carroll filed the only objection to Robin's motion to approve the compromise settlement with Viscomi, the personal representative and conservator regarding settlement offers from MDOT and McGunagle.  He did not cross examine Sandler, and did not offer any other evidence

in opposition to approval of the settlement.  Sandler's testimony in favor of the settlement is uncontroverted, and corroborated by Viscomi's testimony.

Above, the Court recited the evidence under the four *A & C Properties* factors.  Three of the four factors clearly weigh in favor of approval of the settlement.  The fourth factor, collection, is not a factor because of insurance coverage and MDOT being an arm of the state. The probability of success on the merits against the MDOT, which offers $320,000 in settlement, is not high.  Viscomi testified that MDOT has never lost a defective design case.  The complexity of the cases, delay and cost to litigate all weigh heavily in favor of the compromise.  The interest of the creditors weighs in favor of the settlement.  The $60,000 allocated to Robin in Ex. 18 will contribute to her reorganization and ability to pay her creditors, without affecting her ability to pursue recovery from the remaining defendants in the damages case.

Carroll is not a creditor, and as a result of the above discussion he has no lien or interest in the settlement proceeds to be deposited in the Trust Fund.  Therefore, the Court finds and concludes, after consideration of the *A & C Properties* factors, that the proposed settlement is fair and equitable and satisfies F.R.B.P. 9019(a).  Robin's motion to approve compromise settlement will be granted and the settlement agreement at Ex. 17 between Robin individually, the personal representative, conservator of BC, and Viscomi will be approved by separate Order.

### C.  Count IV – Contempt for Violation of the Automatic Stay.

Count IV seeks actual damages, attorneys' fees, costs and punitive damages against Carroll for willful violation of the stay under § 362(k)(1) when Carroll attempted levy on execution of the first writ, and his issuance of the second writ.  Carroll seeks dismissal of Count IV.

36

Carroll contends that nothing in the record establishes a violation of the stay by him. He argues that he asserted his right to recovery against Nigel's property, and that Robin and Viscomi each acknowledged that he sought only Nigel's property and did not seek payment from Robin. Robin contends that Carroll was put on notice of Robin's claim of interest in the Trust Fund by Viscomi's affidavit filed in state court on December 6, 2010, but that Carroll served the first writ after that, and filed a second writ after the sheriff's sale and after Robin initiated this adversary proceeding.

Robin's filing of her bankruptcy petition on November 19, 2010, gave rise to an "automatic stay." 11 U.S.C. § 362(a). The Ninth Circuit has repeatedly reiterated the broad scope of the automatic stay as "one of the most important protections in bankruptcy law." *See In re Risner*, 317 B.R. 830, 835 (Bankr. D. Idaho 2004), quoting *Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1214-15 (9th Cir. 2002). The Ninth Circuit construed the automatic stay in *Gruntz*, 202 F.3d at 1081-82:

> The automatic stay is self-executing, effective upon the filing of the bankruptcy petition. *See* 11 U.S.C. § 362(a); *The Minoco Group of Companies v. First State Underwriters Agency of New England Reinsurance Corp.* (*In re The Minoco Group of Companies*), 799 F.2d 517, 520 (9th Cir.1986). The automatic stay sweeps broadly, enjoining the commencement or continuation of any judicial, administrative, or other proceedings against the debtor, enforcement of prior judgments, perfection of liens, and "any act to collect, assess or recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. § 362(a)(6).

Section 362(k)[25] in effect in this case provides:

> [A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages.

---

[25] Section 362(h) was amended and redesignated to § 362(k) by enactment of BAPCPA in 2005.

*Leetien, P.C., v. Roman (In re Roman)*, 283 B.R. 1, 9 (9th Cir. BAP 2002).

An award of attorney's fees and costs is mandatory as actual damages upon finding a willful violation of the stay under § 362(k). *Roman*, 283 B.R. at 9-10. The BAP in *Roman* cited Congress' intent that an award of attorney's fees and costs is mandatory upon a finding of a willful violation of the stay. 283 B.R. at 7, 9-10; *Beard v. Walsh (In re Walsh)*, 219 B.R. 873, 876, 879 (9th Cir. BAP 1998); *Ramirez v. Fuselier (In re Ramirez)*, 183 B.R. 583, 589 (9th Cir. BAP 1995).

The BAP in *Roman* reiterated the long-standing rule followed by this and other courts that a violation of the stay is willful if (1) the creditor knew of the stay, and (2) the creditor's actions which violated the stay were intentional. 283 B.R. at 8; *Leetien & Adler*, 309 F.3d at 1215; *In re Reece*, 15 Mont. B.R. 474, 477-78 (Bankr. D. Mont. 1996), citing *In re Lile*, 103 B.R. 830, 836, 841 (Bankr.S.D.Tex.1989). In *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1191 (9th Cir. 2003), the Ninth Circuit noted that § 362(k) provides for damages for willful violation of the stay upon a finding that the defendant knew of the automatic stay and that the defendant's actions, which violated the stay, were willful. *See also Havelock v. Taxel (In re Pace)*, 67 F.3d 187, 191 (9th Cir. 1995) (cited in *Roman*, 283 B.R. at 12-13).

A party with knowledge of bankruptcy proceedings is charged with knowledge of the automatic stay. *Dyer*, 322 F.3d at 1191, *citing Pinckstaff v. United States*, 974 F.2d 113, 115 (9th Cir. 1992). Further, "once a creditor or actor learns or is put on notice of a bankruptcy filing, any actions intentionally taken thereafter are 'willful' within the contemplation of § 362([k])." *Risner*, 317 B.R. at 835, citing *Leetien & Adler*, 309 F.3d at 1215; *In re Forty-Five Fifty-Five, Inc.*, 111 B.R. 920, 923 (Bankr. D. Mont. 1990).

No dispute exists that Carroll had knowledge of Robin's bankruptcy case, and therefore he had knowledge of the automatic stay when he sought enforcement of the first writ. However, this

is not a case involving actions taken by Carroll against property of the estate which existed as of the commencement of the case.  Robin argues that Carroll willfully violated the stay by his execution of the first writ in December of 2010.  But Robin did not purchase Nigel's interest in the Trust Fund until the sheriff's sale on May 3, 2011.  Robin's brief argues that Carroll willfully violated the stay, but she testified more than once that Carroll never asked her for money or for her property, and that Carroll sought to levy on execution only of Nigel's property.  Viscomi's testimony was to the same effect.

Carroll did not commence or continue an action against the Debtor, or against property of the estate, until he served Viscomi with the second writ, Ex. V, after Robin had purchased Nigel's interest in the Trust Fund at the sheriff's sale.  Based on Robin's and Viscomi's testimony, the evidence shows and the Court finds that Carroll willfully violated the stay by serving the second writ, but not before.  Carroll knew of the automatic stay, and his action in serving Viscomi with the second writ in June 2012 was intentional and constitutes a willful violation of the stay.  *See Roman*, 283 B.R. at 8; *Leetien*, 309 F.3d at 1215.

It does not matter whether Carroll believes that his actions were justified, either to protect his interests or because he believed the stay did not apply because there was new money going into the Trust Fund after Robin was paid the $50,000 under Ex. 1.  Carroll did not file a motion to modify stay before serving his second writ of execution, and relief from the stay was not granted.  "The creditor takes the risk of being assessed for damages if he fails to obtain clarification from the bankruptcy court."  *In re Forty-Five Fifty-Five, Inc.*, 111 B.R. at 923, quoting *In re Lile*, 103 B.R. at 837.  A party's violation of the stay may be willful even if a creditor believed itself justified in taking an action found to be violative of the automatic stay.  *In re Cinematronics, Inc.,* 111 B.R. 892, 900 (Bankr. S.D. Cal. 1990), the court wrote:

39

The creditor takes a calculated risk where it undertakes to make its own determination of what the stay means. *In re Gray*, 97 B.R. 930, 936 (Bankr. N.D. Ill. 1989). To disagree with Theodore Roosevelt, at least when the automatic stay is concerned, it is far better to be a "timid soul" who seeks a court determination of the limits of the stay, rather than to fail "while daring greatly".

Actions taken in violation of the automatic stay are void, not merely voidable. *Lone Star Sec. & Video, Inc. v. Gurrola (In re Gurrola)*, 328 B.R. 158, 175 (9th Cir. BAP 2005); *Gruntz*, 292 F.3d at 1082. Carroll did not seek relief from the stay before he attempted execution of his second writ. His actions in execution of his second writ were in willful violation of the stay and void, and subject Carroll to sanctions. In *Leetien*, the bankruptcy court imposed sanctions for willful violations of the stay, and the district court and Ninth Circuit affirmed. 309 F.3d at 1212. Concluding, the Ninth Circuit wrote:

> We conclude that § 362(a) imposes an affirmative duty to discontinue post-petition collections actions. Sanctions are appropriate pursuant to § 362(h) because Eskanos willfully violated the automatic stay by maintaining the active collection action and unjustifiably delaying its dismissal after receiving notice of the bankruptcy petition.

*Leetien*, 309 F.3d at 1216.

In construing *Leetien*, a district court notes that the Ninth Circuit in that case, "defines discontinuation as either a dismissal *or* stay of proceedings." *Johnston v. Parker (In re Johnston)*, 321 B.R. 262, 286 (D. Ariz. 2005) (emphasis in original), quoting *Leetien*, 309 F.3d at 1214 ("A party violating the automatic stay, through continuing a collection action in a non-bankruptcy forum, must automatically dismiss or stay such proceeding or risk possible sanctions for willful violations pursuant to § 362([k])").

Based on the record, this Court finds and concludes that Robin has satisfied her burden of proof to show that Carroll willfully violated the stay, evidenced by his attempted execution of the second writ by levying on the Trust Fund in Viscomi's possession. In fixing the amount of

sanctions, however, the Court notes that the BAP has observed that "fee shifting statutes, like §

362([k]) have given debtors an opportunity to use the statute as a sword rather than a shield against

creditors, to courts' dismay[,]" and "that rewarding debtors too lavishly in § 362([k]) actions will

encourage a cottage industry of precipitous § 362([k]) litigation[.]" *Roman*, 283 B.R. at 11,

quoting *McLaughlin v. Fireman's Trust Mortgage Corp. (In re McLaughlin)*, 96 B.R. 554, 560

(Bankr. E.D. Pa. 1989).

Under *Roman* the Court must examine whether the Debtor could have mitigated her

damages, and in determining the appropriate amount of attorney's fees to award courts look "to

two factors:  (1) What expenses or costs resulted from the violation; and (2) what portion of those

costs was reasonable, as opposed to costs that could have been mitigated." *Roman*, 283 B.R. at 12,

quoting *In re GeneSys, Inc.,* 273 B.R. 290, 296 (Bankr. D.C. 2001) (other citations omitted).

"Courts especially scrutinize cases where the debtor's only injuries are those incurred in litigating

the motion for sanctions, and where there exist no circumstances warranting punitive damages."

*Roman*, 283 B.R. at 12 (citing cases).

The instant Count IV requires special scrutiny because Robin's only damages shown by the

evidence are attorneys fees and costs.  Robin asks for her own attorney's fees and costs, and

Viscomi's fees and costs, incurred not only when Carroll attempted execution of the second writ,

but also before Robin purchased Nigel's interests in the Trust Fund.

The Court will not award fees and costs for Carroll's actions before Nigel's interests in the

Trust Fund became property of the estate.  In addition, once a violation of the stay has ended, any

attorney fees the debtor incurs after that point in pursuit of a damage award would not be to

compensate for "actual damages" under § 362(k)(1), and so cannot be recovered under the

"American Rule."  *Sternberg v. Johnston*, 595 F.3d 937, 947 (9th Cir. 2010).  Thus, this Court will

scrutinize Robin's request for her attorney fees and costs, and will award only those incurred in relation to her Count IV resulting from the stay violation itself.  *Sternberg v. Johnston*, 595 F.3d at 947.  Her attorney fees and costs will not be awarded for Counts I and III, or with respect to the settlement motion.  The Court finds that insufficient evidence exists in the record to support an award of punitive damages.

Robin offered no evidence of actual damage caused by Carroll's execution of his second writ other than attorneys fees and costs.  Carroll's collection efforts, in the end, recovered nothing. Viscomi refused to turn over Nigel's interests in the Trust Fund to Carroll's levying officer[26].

Robin argues for an award of attorney's fees and costs for Viscomi, because his fees and expenses are payable from the Trust Fund and decrease Robin's interest in the fund.  The Court declines to award Viscomi any fees and costs from Carroll's violation of the stay.  Viscomi could have mitigated most if not all of his fees and costs by utilizing applicable state and federal rules. He could have interpleaded Nigel's interest in the Trust Funds in state court and, after Robin purchased those interests making them property of the estate, he could have interpleaded Nigel's interest under Rule 7022.  Viscomi testified that he was not comfortable interpleading the funds. The Court finds that Viscomi failed to mitigate his fees and costs, and denies Robin's request for an award of Viscomi's fees and costs.

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction of this Chapter 11 case under 28 U.S.C. § 1334(a) & (b).

2.  The remaining claims in this adversary proceeding to determine the validity and

---

[26]  Robin does not seek sanctions against Viscomi, who until recently exercised control over property of the estate, i.e., Nigel's interests in the Trust Fund, without seeking relief from the automatic stay.

priority of liens and interests, seeking a judgment of contempt against Carroll for violation of the automatic stay, and the motion approval of compromise settlement, are core proceedings under 28 U.S.C. § 157(b)(2).

3.  Plaintiff is entitled to judgment under Counts I and III that Defendant Peter F. Carroll has no lien or interest in the Trust Fund of claims, recoveries, and proceeds resulting or arising out of Case# DV-09-1488(A) and #DP-09-67(A) in the Montana Eleventh Judicial District Court, Flathead County.  Plaintiff purchased Nigel's interests in the Trust Fund at sheriff's sale. Carroll's officer's lien expired after 120 days.  Carroll's voluntary lien is subject to Robin's strong arm power under 11 U.S.C. § 544(a)(1).  His second writ of execution is void.

4.  Robin satisfied her burden to show that the compromise settlement with Hanna's Estate, the conservatorship, and Viscomi is fair and equitable and satisfies F.R.B.P. 9019(a).

5.  Robin satisfied her burden of proof to show by a preponderance of the evidence that Carroll willfully violated the automatic stay by attempting execution of his second writ in June 2011, but not before.

6.  Robin's only injuries from Carroll's willful violation of the stay are attorney's and costs. Insufficient evidence exists warranting an award of punitive damages.  *Roman*, 283 B.R. at 12. Viscomi failed to mitigate his attorney's fees and costs.

**IT IS ORDERED** a separate Order will be entered in the above-captioned Chapter 11 case granting Debtor's motion for approval of compromise settlement (Dkt. 451) and approving the settlement.

**IT IS FURTHER ORDERED** a separate Order shall be entered granting the Plaintiff 14 days to file an affidavit of her attorney's fees and costs incurred with respect to only Count IV of

the amended complaint; and granting Carroll 14 days thereafter to file a response.  If necessary the

Court will schedule a hearing on the reasonableness of Plaintiff's attorney's fees and costs, after

which the Court will enter a separate Order and Judgment against Carroll under Count IV of the

amended complaint for willful violation of the automatic stay under 11 U.S.C. § 362(k).

      **IT IS FURTHER ORDERED** a separate Judgment shall be entered against Defendant

Peter F. Carroll in favor of the Plaintiff under Counts I and II of the amended complaint, providing

that Defendant Peter F. Carroll has no lien against or interest in the Trust Fund of claims,

recoveries, and proceeds resulting or arising out of Case #Nos. DV-09-1488(A) and

#DP-09-67(A) in the Montana Eleventh Judicial District Court, Flathead County.

                                        BY THE COURT

                                        HON. RALPH B. KIRSCHER
                                        U.S. Bankruptcy Judge
                                        United States Bankruptcy Court
                                        District of Montana